UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20759-CR-**JORDAN**/Torres

UNITED STATES OF AMERICA,

        Plaintiff,

v.

RICARDO OLMEDO,

        Defendant.

## **DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE**

The Defendant, Ricardo Olmedo, through undersigned counsel, respectfully requests that this Honorable Court enter an order suppressing all illegally-obtained interceptions of his wire, electronic, and oral communications. As grounds therefore, it is alleged that:

**(1)** As an "aggrieved person," Mr. Olmedo has standing to seek the suppression of his intercepted communications insofar as he was "a party to . . . [the] intercepted wire, oral [and] electronic communication[s]," and/or he was a "person against whom the interception[s] w[ere] directed" as defined by 18 U.S.C. §2510(11).

**(2)** Mr. Olmedo is entitled to the suppression of all of his intercepted communications because of the government's inability to present sufficient facts satisfying the requirements of 18 U.S.C. §2518(1)(c), or supporting a judicial finding pursuant to 18 U.S.C. §2518(3)(c) that normal investigative procedures were tried and

1

failed or that it reasonably appeared at the time the interceptions were requested that normal investigative procedures were unlikely to succeed if tried or that they were too dangerous to attempt.

**(3)** To the extent that the government failed to minimize Mr. Olmedo's non-pertinent communications in violation of 18 U.S.C. 2518(5), suppression of these non-pertinent intercepted communications must be ordered.

## ARGUMENT

I.   **Introduction**

From July 25, 2007, to August 23, 2007, DEA Special Agent Shane Catone submitted two applications for the interception of wire communications over telephone numbers assigned to, and used by, the targets of the investigation underlying the instant prosecution. Among the individuals targeted by the government were **Michael Olmedo**, Jose **Linares**, Serafin **Debesa**, Mohammed **Zahran**, **Angel Hernandez**, Alexandra **Garcia**, Hugo **Rodriguez**, Manuel **Villar**, Thomas **Padilla**, Ricardo **Cacares**, **Ricardo Olmedo**, Alfred **Saltos**, Douglas **Carmenate**, **Bryant Olmedo**, Luis **Gomez**, **Raul Hernandez**, and others. The two sworn affidavits submitted to the Court in support of the Government's wire tap applications, along with other related materials, have been provided in discovery. Orders granting each of these applications were signed immediately following their submission, and over 13,000 telephone communications were thereafter intercepted and recorded involving the aforementioned individuals and countless others. According to counsel for government, the prosecution intends to use an, as yet, undetermined number of these conversations, as well as

evidence derived therefrom, at trial.

### II. The Defendant has standing to challenge the two wiretap orders as Mr. Olmedo was a party to the intercepted conversations as well as a person against whom the interceptions were directed.

To be conferred standing to challenge a wiretap authorized pursuant to Title III, one must be an "aggrieved person" as that term is defined by the statue. *See* 18 U.S.C. §2510 (11); *United States v. King*, 478 F2.d 494, 507 (1973) ("a defendant may move to suppress the fruits of a wiretap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversations occurred on his premises"); *United States v. Scasino*, 513 F.2d (5th Cir. 1975); *United States v. Cruz*, 594 F.2d 268, 273 (1st Cir 1975); *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2nd Cir. 1991). This section defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." 18 U.S.C. §2510(11). Therefore, and as the plain language of the statute clearly states, standing to challenge the legality of a wiretap order depends on whether the person seeking to challenge the wiretap is either the party named in the order or one whose conversations were intercepted pursuant to the order. *See King,* 478 F.2d at 1303. This statutory scheme conforms to well-established Fourth Amendment requirements for Standing. *See United States v, Gallo*, 863 F.2d 185, 192 (2nd Cir. 1988) (Title III suppression provisions are construed in accordance with the standing requirements of the Fourth Amendment).

Ricardo Olmedo has standing to challenge the wiretaps at issue for two reasons. First, he was among the persons against whom the interceptions were directed. Courts

have stated that this fact alone sufficiently confers standing to challenge an intercept order. *Ruggiero,* 928 F.2d at 1303; *King,* 478 F.2d at 507. More certainly, however, he had his personal and private conversations intercepted when he expected that these conversations would remain private. *King,* 478 F.2d at 507; *Ruggiero,* 928 F.2d at 1303. *See also, United States v. Montoya-Echevarria,* 892 F.Supp.104 (S.D.N.Y. 1995). Ricardo Olmedo therefore asserts a privacy interest in his own private communications, as opposed to a derivative or attenuated expectation of his privacy. *United States v. Restrepo,* 890 F. Supp. 180, 202 (E.D.N.Y. 1995) ("As a conversant, [defendant's] claim does not rest on a violation of [the target's] rights, but instead is personal to him."). As a result, and insofar he was a party to the intercepted conversations, he has standing to challenge the propriety of the Court's intercept orders.

> III. **Because the government's normal and ongoing investigative procedures were highly successful and likely to continue being so, traditional investigative techniques were sufficient to expose the crimes alleged in the Indictment and the government failed to show a necessity sufficient to issue a warrant authorizing the wiretaps at issue.**

An electronic interception, by its very nature, is a highly intrusive form of investigation. Because of this, all wiretap applications must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(b). The basis for the requirement

> is the salutary notion that the sovereign should make **a reasonable, good faith effort to run the gamut or normal investigative procedure** before resorting to means so intrusive as electronic interception to telephone calls.

4

*United States v. Hoffman*, 832 F.2d 1299, 1306-1307 (1st Cir. 1997) (emphasis added). Indeed, Congress promulgated this requirement to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988), *quoting United States v. Kahn*, 415 U.S.143, 153 n.12 (1974). In constructing this provision, the Supreme Court clearly acknowledged that:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evidenced the clear intent to make doubly sure that the statutory authority be **used with restraint** and **only** where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation . Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

*United States v. Giordano*, 416 U.S. 505, 515 (1974)(citing 18 U.S.C. §2518(1)(c) and (3)(c)(emphasis added). The Supreme Court has also recognized that the "[t]he plain effect of the[se] detailed restrictions . . . is to guarantee that the wiretapping or bugging occurs only when there is a genuine need for it and **only to the extent that it is needed**." *Dalia v. United States*, 441 U.S. 238, 250 (1979) (citations omitted) (emphasis added).

The government is therefore required to set out by averment in the wiretap affidavit a **truthful** "factual predicate" to justify the use of a wiretap. *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977). In doing so, however, purely conclusory statements or boilerplate allegations are not, in the absence of specific facts, sufficient. *United States v. Robinson,* 698 F.2d 448, 453 (D.C. Cir. 1983); *United States v. Kerrigan*, 514 F.2d 35 (9th Cir.); *cert. denied*, 423 U.S. 924 (1975). Indeed, wiretaps are

5

not to be routinely employed in criminal investigations; "what counts is whether the agent's assertions are supported by the facts in the affidavit and the nature of the investigation being conducted." *United States v. Dorfman*, 542 F. Supp. 345, 349 (N.D. III, 1982); *United States v. Lambert,* 771 F.2d 83 (6th Cir. 1985). Wiretaps also "are not to be used thoughtlessly or in a dragnet fashion." *United States v. Alfano, supra; United States v. Martinez*, 588 F.2d 1227, 1231 (9th Cir. 1979).

The purpose of requiring specificity regarding the details of the investigation is "to enable the district judge to determine, independently of an agent's assertion with respect to his or other agent's experiences, that ordinary investigative techniques very likely will not succeed . . . ." *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977. In *Spagnuolo*, the court added that

> [t]o show that "other investigative procedures have been tried and failed" the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends.

549 F.2d at 710.

It is therefore well-established that "the government must overcome the **statutory presumption against granting a wiretap application** by showing necessity." *United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985) (emphasis added). In fact, the government "must allege specific circumstances that render normal investigative techniques ineffective or the application must be denied" *Id.* Certainly, this statutory requirement was not created "to force the government to run outlandish risks or to exhaust every considerable alternative before seeking a wiretap." *United States v.*

*Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987). On the other hand, wiretapping is not to be used as a matter of course simply because it is easy.

> Section 2518(1)(c) and (3) (c) are designed to ensure that the relativity intrusive device of wiretapping is neither "routinely employed as the initial step in criminal investigation," *United States v. Giordano*, 416 U.S. 505, 515, 94 S. Ct. 1820, 1827 (1974), nor resorted to in situations where traditional investigative techniques would suffice to expose the crime, *United States v. Kahn*, 415 U.S. 143 153, n. 12, 94 S. Ct. 977, 983 n. 12 (1974).

*United States v. Smith, 31 F.3d 1294, (4th Cir 1994).*

Each of the government's wiretap affidavits in this case contains the boilerplate allegation that "[n]ormal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ." [July 25, 2007, affidavit at 6; August 23, 2007, affidavit at 6]. Each of the affidavits therefore concluded that the interception of the targeted wire communications was "the **only available to law enforcement technique**" that has a reasonable likelihood of revealing and of securing evidence needed to establish the full scope and nature of the targets offenses being investigated" and to eventually prosecute the targets. [July 25, 2007, affidavit at 19; August 23, 2007, affidavit at 20 ] (emphasis added). Each affidavit then sets forth virtually **identical boilerplate** litanies of the government 's allegedly failed "alternative investigative techniques." *Id.*

However, and despite these repeated boilerplate claims, the government's affidavits utterly fail to establish, with factual particularity, that normal investigative techniques had actually failed. Rather, and ironically, the government's affidavits, themselves, clearly demonstrate that such alternative techniques were **very** successful and that continued success of these techniques was not only quite likely, but it was

7

virtually assured. At least two **confidential informants**, several **agents and law enforcement personal**, **surveillance, pen registers,** and **actual seizures** not only produced sufficient evidence to successfully prosecute the Defendants in this case, but wholly obviated the necessity for the wiretaps now at issue.

### The Informants, consensual recordings, surveillance, and drug seizures

The government 's investigation of this case began in or about December of 2006. Thereafter, the Government used a highly successful confidential source (hereinafter "CS") and confidential defendant (hereinafter "CD") to infiltrate the targeted organization, gather evidence of <u>actual</u> criminal activity, consensually record telephone calls, engage in repeated undercover purchases of narcotics, and provide intelligence information to the governmental agencies participating in this investigation. These individuals were not only successful at infiltrating the alleged criminal organization targeted by the government in this case, but they were also very successful in gathering evidence and providing it to law enforcement for use at trial.

The efforts of these cooperating persons and law enforcement are summarized below:

- On May 10, 2007, during a meeting observed by law enforcement, the CS and Michael Olmedo discussed past, future, and current drug transactions. The two discussed prices for multiple kilograms of cocaine. Michael Olmedo admitted that he currently purchases kilograms of cocaine and discussed the price per kilogram, and he admitted he had just received a shipment from his source who, in turn, obtains it directly in Colombia. Michael Olmedo also stated he obtains MDMA pills from New York and

discussed prices. He admitted receiving a quantity of pills from his source, "Chino," in Opa Locka, and he traveled with the CS in his car and stated he had a kilogram of cocaine in a shoebox inside the car with him at the time.

- On June 7, 2007, the CS consensually recorded a telephone conversation with Michael Olmedo regarding the purchase of an ounce of crack cocaine. Michael Olmedo stated he had recently received kilograms of cocaine and was selling it that evening.

- On June 7, 2007, law enforcement surveilled Michael Olmedo pick up Alexandra Garcia and drive to the residence of Manuel Villar. Agents learned from the CD that the residence was used as a stash house. While conducting the surveillance, agents observed the three exit the residence with a black bag. Agents followed Michael Olmedo, watched him meet with another individual, and exchange a plastic bag containing what appeared to be a brick of cocaine to the person in exchange for money. According to the agents surveilling Michael Olmedo, he made several similar "deliveries" the same evening.

- On June 11, 2007, the CS was contacted by a confederate who advised that Debesa and Linares had just consummated a 5 kilogram transaction and that Linares had recently returned from Mexico with 20 kilograms of cocaine. The CS consensually recorded the conversation.

- On June 11, 2007, the CD was contacted by Debesa and asked to help "cut" some of the cocaine for distribution. Debesa also told the CD that he (Debesa) had sold 3 kilograms of the cocaine and provided 2 kilograms to Michael Olmedo. The CD recorded these conversations as well.

- On June 14, 2007, the CD contacted Debesa and negotiated the purchase of one ounce of cocaine. Padilla and Debesa later met with the CD and CS (who were working as a team for law enforcement) and the transaction took place in exchange for law enforcement funds. The substance tested positive for cocaine, and the conversations and meeting were recorded.
- On June 20, 2007, the CD recorded a phone call from Michael Olmedo to him wherein Michael Olmedo stated that he had just been paid a debt with 12 ounces of heroin. Law enforcement personnel were present with the CD during the phone call.
- On June 20, 2007, the CD recorded another phone call from Michael Olmedo, in the presence of law enforcement, wherein Michael Olmedo told the CD that he (the CD) could pick up an ounce of heroin the following day for $1,000.00.
- On June 21, 2007, the CD recorded a conversation with Michael Olmedo to negotiate for the purchase of heroin. The call was also monitored by law enforcement who were present with the CD at the time he had the conversation. Later that same day, the CD met with Caceres who provided the CD and CS (still working as a team) with a package containing a substance that tested positive for heroin.
- On June 22, 2007, the CD called Michael Olmedo in the presence of law enforcement who were monitoring and recording the phone call. Michael Olmedo agreed during the call to meet the CD to be paid for the heroin transaction that occurred the previous day. Later, Michael Olmedo met with the CD and CS (still a team) and law enforcement funds were provided to Michael Olmedo for the heroin. Michael Olmedo also told the two that he had some cocaine and that he was about to pick it up from Villar.
- On August 1, 2007, law enforcement established surveillance on Carmenate and

Alexandra Garcia. Law enforcement observed the two meet and exchange a package. Law enforcement continued surveillance on Carmenate and observed him meet with Ramon Medina-Fletes. Law enforcement then conducted a traffic stop of Medina-Fletes and seized one ounce of cocaine from him.

- On August 2, 2007, law enforcement again established surveillance on Alexandra Garcia. Undercover law enforcement attempted to stop her vehicle, but before doing so, she discarded a kilogram of cocaine from her car window. Law enforcement then seized the cocaine.

Interestingly, though, once the first wiretap authorization was provided, the efforts of the CD and CS faded. This is despite the fact that these informants had gained direct access to the targets of the government's investigation and each, in turn, was able to converse with, and in many instances, actually make consensual recordings of the targets of the investigation. As detailed in the wiretap affidavits, these informants provided the identities of co-conspirators as well as nature of the alleged crimes and the date(s) that these alleged crimes were committed. Through the use of these informants, the government obtained significant intelligence information and assembled a great deal of evidence for use at trial. Both of these confidential sources funneled information related to the inner workings of the alleged criminal enterprise for the length of the government's investigation. Moreover, each participated in the seizure of both heroin and cocaine. Indeed, had the efforts of these two individuals continued, law enforcement could have built seizure upon seizure, conversation upon conversation, and returned an Indictment as strong as, if not stronger than, the one that was eventually returned.

### Pen registers and telephone records

From April 9, 2007 through July 17, 2007 the government obtained evidence relating to over 13,500 phone calls as a result of pages of pen register and telephone information. [July 27, 2007 affidavit of 18]. These records, according to the government, corroborated information provided by its informants and undercover agents. *Id.* However, following the first wiretap authorization, law enforcement took a contrary, dim, and rather self-serving view of the utility of these records, stating that "these law enforcement techniques have not achieved all of the goals of the investigation [and] . . . provide only circumstantial evidence that the target telephone was used to make or receive calls to and from other telephones." August 23, 2007 affidavit at 23.

### Search Warrants

The Government's wiretap affidavits also claim that "the use of search warrants and interviews is premature" as "these techniques would alert the [targets] to the existence of the investigation and would prevent law enforcement from identifying other co-conspirators or seizing contraband and may very well lead to the targets of this investigation fleeing the jurisdiction." August 23, 2007 affidavit at 25. This position is utterly inaccurate in every way with regard to each of the defendants in this matter. In fact, the government's execution of search warrants following Ricardo Olmedo's arrest actually <u>proves</u> the contrary. Indeed, following the arrest of Ricardo Olmedo on September 12, 2007, several successful search warrants were issued resulting in the seizure of well-over $100,000.00 in currency, narcotics, and weapons. Thus, the

affiant's self-serving statements concerning the government's desire to investigate the full range of possible criminal activity involving the alleged criminal organization simply did not offer any legal justification for the intercepts at issue.

In reality, the government's affidavits really asked the Court to permit it to make an easier case by use of the wiretaps. And despite the boilerplate suggestion that a wiretap is necessitated because of the government's lack of success with alternative investigative techniques, there is simply no basis for this conclusion. *See e.g., United States v. Lilla*, 699 F.2d 99 (2nd Cir. 1983); *United States v. Kalustian*, 529 F.2d 585 (9th Cir. 1975); *United States v Ailemen*, 1997 U.S. Dist. LEXIS 20359 (N.D. Cal. 1997).

In *Kalustian*, the insufficient wiretap affidavit set forth several "facts" in support of the government's contention that it had exhausted normal procedures. The affidavit recited that (1) informants would not testify; (2) toll records, although possibly available, were not sufficient to establish guilt; (3) surveillance would be inadequate; and (4) the affiant's "knowledge and experience" led to the conclusion that normal investigative techniques would not succeed because essentially, gambling cases are "hard to crack." The court found that the FBI had relied on conclusory boilerplate language and had discarded alternative means of investigation because gambling cases "are hard to crack." *Kalustian*, 529 F.2d at 589.

Further, the Court said:

> Obviously, electronic surveillance can facilitate investigation. Because other investigative techniques are usually slower and more difficult, Congress did not require exhaustion of "all possible investigative techniques" before order of wire taps would be issued.... But Title III <u>does not</u> allow wiretapping unless they have been tried <u>and</u> failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

13

*Id.* at 590. In *Lilla, supra*, the affidavit was found insufficient because of its conclusory character and because the court found that other investigative techniques were working. Specifically: (1) the affiant made <u>one</u> "buy" from Lilla; (2) the affiant obtained an admission against penal interest from Lilla's brother; (3) Lilla was not apprehensive about dealing with the affiant; and (4) surveillance, although marginally successful, should have been given more time to succeed. *Id.* at 105, n.6. *Lilla* is yet another classic case of a wiretap being used as a substitute for normal investigation techniques. This is exactly what is not supposed to occur, but unfortunately what <u>did</u> occur here.

Here, as set out *supra,* the government's investigative techniques were extraordinarily successful. Although two months of wiretaps may well have provided additional relevant evidence giving the government a stronger case, it clearly failed to demonstrate the statutorily-mandated necessity for this type of an intrusion. Accordingly, the fruits of a wiretap must be suppressed.

**IV.   Because of the government's failure to minimize Mr. Olmedo's non-pertinent communications, all non-minimized, non-pertinent interceptions must be suppressed.**

As a result of the orders granting the aforementioned wiretap applications, the government intercepted hundreds of communications made by Mr. Olmedo and unknown number of which it will use as evidence in this case. A great deal of these conversations are not pertinent to the charges against Mr. Olmedo in this instant case. Thus, it is clear that the government's execution of the orders granting the wiretap applications referenced above was not carried out " in such a way as to minimize the interception of communications not otherwise subject to interception" 18 U.S.C.

§2518(5).

Any order authorizing the interception of telephonic communications pursuant to 18 U.S.C. §2518(5) makes it clear that the government is required to minimize certain specified intercepted communications in the appropriate circumstances. The government agents operating the intercept conduct the interception in such a way as to minimize the interception of communications not otherwise subject top interception 18 U.S.C. §2518(5). Indeed, the government recognizes this clear statutory mandate by virtue of the fact in each of its wiretap applications, it states that;

> [a]ll interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code....Monitoring of conversation will terminate immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overhear that the conversation is criminal in nature. Spot monitoring of non-criminal conversations will be done to ensure that those conversations have not turned criminal in nature.

[See composite exhibit A]. Moreover, it is the government's burden to demonstrate that the wire intercepts at issue were conducted in a manner that minimized its interception of non-relevant telephone conversations. *See e.g., Scott v. United States*, 436 U.S. 128, 98 S. Ct.1717 (1978).

15

**WHEREFORE**, the Defendant, Ricardo Olmedo, through undersigned counsel, respectfully requests that this Honorable Court enter an order suppressing all illegally-obtained interceptions of his wire, electronic, and oral communications.

Respectfully submitted,

LAW OFFICES OF PAUL D. PETRUZZI, P.A.
169 East Flagler Street
Suite 1241
Miami, FL 33131
Telephone: (305) 373-6773
Facsimile:  (305) 373-3832
Email: petruzzi-law@msn.com


By:   /s/   Paul Petruzzi
      **PAUL D. PETRUZZI, ESQ.**
      Florida Bar No. 982059


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2008, a true and correct copy of the foregoing was furnished by CM/ECF to Sean Cronin, Office of the U.S. Attorney, 99 NE 4th Street, Miami, Florida 33132.

By:   /s/   Paul Petruzzi
      **PAUL D. PETRUZZI, ESQ.**
      Attorney for Ricardo Olmedo