UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20759-CR-JORDAN-TORRES


UNITED STATES OF AMERICA,

       Plaintiff,

v.

RICARDO OLMEDO,

       Defendant.
_____/

**REPORT AND RECOMMENDATION ON DEFENDANT
RICARDO OLMEDO'S MOTION TO SUPPRESS FRUITS
OF ILLEGAL SEARCH AND SEIZURE**

THIS CAUSE came before the Court on Defendant Ricardo Olmedo's Motion to Suppress Fruits of Illegal Search and Seizure [**D.E. 320**], the government's Opposition thereto [D.E. 362], Defendant's Post-Hearing Reply [D.E. 419], and the government's Response to the post-hearing reply [D.E. 422]. This matter was referred to the undersigned Magistrate Judge by the Honorable Adalberto Jordan for report and recommendation. [D.E. 369]. An evidentiary hearing was held on February 21, 2008.[1] Having carefully considered the motion and opposition thereto, the arguments of counsel, the testimony of the four government witnesses and of Defendant, the exhibits admitted into evidence at the hearing, and being fully advised in the premises, the Court concludes that Defendant's motion to suppress should be DENIED, as more fully explained below.

---

[1]     A transcript of the hearing is docketed as D.E. 420.

## I. BACKGROUND

Defendant was arrested on September 12, 2007, and charged with one count of conspiracy to possess with the intent to distribute cocaine, heroin, crack cocaine, and marijuana, and one count of possession with the intent to distribute cocaine. [D.E. 11]. His arrest stemmed from a Drug Enforcement Administration ("DEA") investigation of narcotics trafficking activities that resulted in the issuance of a Title III wiretap order for the cellular telephone of Defendant's son, Michael Olmedo.[2] According to the government, prior to September 12, 2007, the date of Defendant's arrest, law enforcement agents had intercepted thousands of telephone calls in which Michael Olmedo discussed the distribution of narcotics. Among those thousands of calls were multiple conversations between Michael and Defendant regarding drug trafficking activities. Agents conducted surveillance of Michael Olmedo and others in which they observed members of the alleged conspiracy engaging in suspected narcotics trafficking activities that corresponded to conversations intercepted by agents. Agents also seized over a kilogram of cocaine based upon information obtained from the wire interceptions.

On September 12, 2007, at approximately 5:41 p.m., agents intercepted a call between Defendant and Michael Olmedo in which Defendant told his son that "that" guy was calling him to go and pick up "that," and Michael told Defendant he was trying to get the money together. [D.E. 406 (Exhibit and Witness List from Feb. 21, 2008, Hrg), Df's Ex. B (Synopsis of Session 10188)]. At approximately 5:55 p.m., another call was intercepted between Defendant and Michael. During the second call, Michael told Defendant that he was trying to get the "tickets;" Defendant told Michael that the guy had two; Michael asked if it was "the

---

[2] Defendants Ricardo Olmedo and Alberto Gonzalez have moved to suppress the wiretap order. [D.E.321, 349]. The validity of the wiretap order will be the subject of a separate Report and Recommendation.

beautiful shit" and Defendant affirmed that it was; Michael said he was getting enough for one; when Defendant asked whether Michael got the full amount from the guy, Michael replied that he got twelve and would put in ten; and they arranged to meet at Defendant's house. [*Id.*, Df's Ex. C (Synopsis of Session 10194)]. The agent supervising the narcotics investigation, DEA Special Agent Francisco Fernandez, was advised of these calls by agents monitoring the wiretap. According to Special Agent Fernandez, "two" meant two kilograms of cocaine; "twelve" and "ten" meant $12,000 and $10,000, respectively; and the gist of these conversations was that Michael was in the process of collecting money to pay for two kilograms of cocaine, that Defendant would soon be meeting someone to exchange the money for cocaine, then he would deliver the drugs to Michael. Based on these intercepted calls, agents established surveillance on Defendant.

Officers followed Defendant's Ford pickup truck from his house to a cul-de-sac in an apartment complex where Defendant met a man in a black Mercedes Benz. Special Agent Fernandez heard over the DEA radio[3] what he called a "play-by-play" account of what an officer who was on the scene was observing: the Mercedes parked near Defendant's truck; the man in the Mercedes exited his car with a bag and got into Defendant's truck; a short while later he exited the truck with another bag in hand; and then both vehicles departed the location.

After hearing this, Special Agent Fernandez authorized a stop of the Mercedes to verify what the wire intercepts had suggested, that there would be an exchange of money and drugs. The Mercedes was stopped and Special Agent Fernandez was advised that a large amount of U.S. currency was found in the car. He also was informed that another call between

---

[3] Fernandez used a DEA radio, which he said was provided to surveillance teams before they went out, including Miami-Dade officers who were working with the DEA. However, regular Miami-Dade officers did not have the DEA radios.

Defendant and Michael Olmedo was intercepted *after* Defendant met with the man in the Mercedes: Defendant told Michael Olmedo that he (Defendant) got "two" from "him; "he" asked for $10,000, otherwise to return it; Michael told Defendant that he (Michael) would pay Defendant back; and Defendant said they were really good. [D.E. 406, Govt. Ex. 1 (Synopsis of Session 10209)].

It was at this point that Special Agent Fernandez gave the order to stop Defendant's vehicle. His decision was based on the two initial intercepted calls regarding the two kilos and the money; the fact that Defendant met with an individual he was supposed to meet; the observations of the officer on the scene regarding the swap of bags on a street in an apartment complex; the fact that the black Mercedes did indeed have almost $20,000 in it; and the third intercepted call in which Defendant confirmed he had picked up the two kilos. Thus, Special Agent Fernandez got on the DEA radio and directed that Defendant be stopped by a marked unit.

Special Agent Fernandez was close to but did not witness the Miami-Dade police officers stop Defendant's truck. When he arrived on the scene, Defendant was already outside his truck. Special Agent Fernandez pulled up behind another officer's vehicle and stayed there. He got on the radio to find out if everything was okay, and to confirm whether officers found the two kilos of cocaine inside Defendant's truck. Once the two kilos were found, Defendant was arrested.

Miami-Dade County Police Detective Julio Benavides, whose role in the narcotics investigation was to conduct roving surveillance or stops as needed, witnessed the meeting between Defendant and the man in the black Mercedes on September 12th. Shortly before the meeting took place, Detective Benavides was contacted by another officer involved in the narcotics investigation, Detective Benjamin Young, and told that Defendant would be driving

a green Ford pickup truck and would be picking up two bricks, or kilos, of cocaine. Detective Benavides was directed to the general vicinity of Bird Road and 114th Avenue, where Defendant's truck was then being followed by other law enforcement agents, and was told to be prepared to conduct surveillance or a stop as needed. Detective Benavides located Defendant's truck and followed it when it turned into an apartment complex. When the truck made a sharp right-hand turn into a cul-de-sac and stopped, the detective parked his unmarked vehicle to the west of the cul-de-sac, facing east, where he was able to observe the truck through his windshield.

Within a couple of minutes, the black Mercedes driven by a Latin male arrived and parked behind the truck. The driver of the Mercedes exited his vehicle, approached the driver's side of the truck, and made contact with the driver. He returned to the Mercedes, retrieved what appeared to be a Publix plastic bag containing something the size of a small book, then walked back to the truck and entered the passenger's side of the vehicle. The two men appeared to be talking and "messing around with" or "looking at" something inside the truck.[4] The men were inside the truck for no more than five minutes, then the Mercedes's driver exited the truck and returned to his car. He was carrying the same plastic bag, but it now contained something smaller than before and was rolled up like a ball. He opened his door and began to use his cell phone, at which time Defendant departed.

Detective Benavides testified that as soon as Defendant's truck left the area, he announced over his Miami-Dade County police radio and the DEA radio assigned to him that the pickup truck was leaving the area. Then, when the Mercedes pulled away a few minutes later, Detective Benavides reported that event as well. He followed the Mercedes for about

---

[4] Detective Benavides was parked approximately thirty feet away from the other two vehicles. He testified that he was high enough off the ground in his vehicle to be able to see over the roof of the Mercedes directly through the back window of the truck.

eight blocks, at which time it was pulled over by a marked county police vehicle. Detective Young joined him at the scene. Detective Benavides approached the Mercedes and observed the same plastic bag with a big roll of money in it on the front passenger seat. Detective Young took custody of the money, then both detectives left the scene to locate Defendant's truck. Shortly after confiscating the money, Detective Young announced this fact over the radio.

At approximately Sunset and Southwest 87th Avenue, the detectives located Defendants' truck, which had just been stopped by two marked county police vehicles. One of the officers on the scene, Sergeant Raul Martinez, approached the two detectives and advised that a kilogram of cocaine had been found inside the truck. Defendant was thereafter advised that narcotics had been found in his truck, read his *Miranda* rights, and arrested.

Detective Young, a City of Miami police detective assigned to work under DEA authority, was positioned at Defendant's house before he left to meet the man in the black Mercedes. Detective Young had received information from the wire room that Defendant might be picking up narcotics for his son Michael Olmedo that day. After setting up surveillance at Defendant's home, Detective Young observed Michael and Defendant exit the house. Michael gave Defendant a plastic bag, then Defendant got in his truck and drove away. The detective followed Defendant in his unmarked vehicle. He noticed that at approximately Bird Road and 114th Avenue, Defendant appeared to make contact with the driver of a black Mercedes who followed him when he drove into a neighborhood and turned down a cul-de-sac. The two vehicles parked and Detective Young set up surveillance outside the housing project where he was unable to see the vehicles.

Detective Young heard a radio transmission (he thought from Detective Benavides) stating there was an exchange being made between Defendant and the individual in the

Mercedes.  Subsequently, the detective received information from the wire room that it had intercepted a call in which Defendant told Michael Olmedo that he (Defendant) possibly had the package with him.  Detective Young then saw Defendant leave the neighborhood and head south on 114th Avenue while the Mercedes left and headed north.  The detective followed the Mercedes until it was pulled over by a marked police unit.  He approached the Mercedes and observed a plastic bag containing U.S. currency on the front passenger seat.  He took custody of the money, approximately $20,000, then he and Detective Benavides left and drove to where officers were following Defendant in his truck.  While en route, Detective Young radioed that he had recovered the money from the Mercedes.  Shortly thereafter, he heard a radio transmission from Special Agent Fernandez directing a stop of Defendant's truck.

Detective Young caught up just as Defendant was being pulled over by two marked police vehicles.  As the other officers spoke with Defendant, Detective Young parked down the road and waited for information from the wire room on how to proceed.  When advised that Defendant would be charged federally (as opposed to facing state charges), the detective approached Defendant and read him his *Miranda* rights on the side of the road.[5]

Miami-Dade County Police Sergeant Raul Martinez was involved in the stop of Defendant on September 12th.  He was on patrol duty when Detective Benavides called to advise that agents were working on a narcotics investigation and, based on their surveillance, were following a truck that was transporting two kilos of cocaine.  The sergeant was asked to stop the vehicle and he and another patrol vehicle were directed to its location by Detective Benavides.  At Sergeant Martinez's direction, the officers in the other patrol vehicle made a traffic stop, then asked Defendant to exit the truck and walk to the back of the vehicle.  As this was occurring, Sergeant Martinez pulled up, exited his vehicle, and walked toward

---

[5]   Defendant had $2,000 in his pocket when he was arrested.

Defendant's truck. None of the officers advised Defendant that he was suspected of possessing narcotics, only that his car matched the description of a vehicle involved in a robbery. The sergeant asked Defendant for identification and whether he had anything illegal in his vehicle. According to the sergeant, Defendant responded in the negative and invited him to take a look.[6] Sergeant Martinez went to the front of the truck, opened the glove compartment and found a white plastic bag that contained two kilos of cocaine. He then walked back to the back of the car and told Detective Benavides, who by then had arrived on the scene, that he found the cocaine.

Defendant has moved to suppress the cocaine seized from his truck on the ground that officers lacked probable cause to stop and search the vehicle. The government counters that officers had probable cause both to stop Defendant and to search his vehicle and, therefore, Defendant's motion to suppress should be denied.

## II.   ANALYSIS

It is well-established that police are permitted to stop and search an automobile without a search warrant if they have probable cause to believe that the vehicle contains contraband and that exigent circumstances necessitate a search. *United States v. Forker*, 928 F.2d 365, 368 (11th Cir. 1991) (citing *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988)). "Probable cause to search exists 'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" *Id.* (citation omitted). Exigent circumstances exist when the inevitable delay incident to obtaining a search warrant must give way to a need for immediate action. *Id.* If there is a possibility that contraband will be destroyed or removed, the exigency of the circumstances justify a

---

[6] Defendant testified with regard to the stop of his vehicle and his alleged lack of consent to search it. His testimony is not relevant to the Court's determination of whether officers had probable cause to support the search.

warrantless search. *Id.* "The ability of the vehicle to become mobile is sufficient to satisfy the exigency requirement." *Id.* (citing *Alexander*, 835 F.2d at 1409); *see also United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) ("the requirement of exigent circumstances is satisfied by the 'ready mobility' *inherent* in all automobiles that reasonably appear to be capable of functioning.") (emphasis in original).

Defendant does not dispute that the exigency prong of the automobile exception to the Fourth Amendment's warrant requirement was met here. Nor does he seriously contest that the officer supervising the narcotics investigation, Special Agent Fernandez, possessed probable cause to believe that narcotics would be found in Defendant's truck. The narrow inquiry here is whether application of the "collective knowledge" doctrine, through which the knowledge of one officer is imputed to another, permits this Court to impute the requisite probable cause to the officer who actually conducted the search of Defendant's truck and discovered the cocaine.

Both parties cite *United States v. Hensley*, 469 U.S. 221 (1985), to support their positions. In *Hensley*, police from one police department stopped Hensley in reliance on a flyer issued by another police department indicating that he was wanted for investigation of an aggravated battery. *Id.* at 229. The trial court denied Hensley's motion to suppress evidence seized from his car after the stop. *Id.* at 225. The appellate court reversed, finding that the police who had stopped Hensley lacked a reasonable suspicion sufficient to justify an investigatory stop because the flyer on which they relied did not include the specific and articulable facts that led the first department to suspect Hensley's involvement in the crime. *Id.* at 225, 230. The Supreme Court disagreed. "Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable

suspicion justifying a stop." *Id.* at 233 (citing *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976) (although the officer who issues a wanted flyer must have a reasonable suspicion to justify an investigatory stop, the officer who acts in reliance on the bulletin need not possess personal knowledge of the evidence creating reasonable suspicion)) (emphasis in original).

In reaching this conclusion, the Court looked to *Whiteley v. Warden*, 401 U.S. 560 (1971), in which police in Laramie, Wyoming stopped a person and searched his car, solely in reliance on a bulletin that described the suspect, his car, and the property taken, but not the evidence that gave a Wyoming county sheriff probable cause to believe the suspect had committed burglary. *Id.* at 230. Ultimately, the Court determined that the county sheriff lacked probable cause to obtain the arrest warrant that had previously issued for Defendant. *Id.* In so ruling, however, the *Whiteley* Court noted:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.

*Id.* (quoting *Whiteley*, 401 U.S. at 568). This language in *Whiteley*, the *Hensley* Court explained,

> suggest[ed] that, had the sheriff who issued the radio bulletin possessed probable cause for arrest, then the Laramie police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause. *Thus Whiteley supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.* In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information

from another jurisdiction.

*Id.* at 230-31 (internal citation omitted) (emphasis supplied).

The government argues that *Hensley* fully supports its position that a police officer who stops an individual in response to a request from another police officer need not be aware of the facts that support a finding of probable cause, so long as the requesting officer possessed probable cause. [D.E. 422 (Govt's Resp. to Df's Post-Hearing Reply) at 1-2]. Defendant, on the other hand, argues that *Hensley* mandates that at least *some* information regarding probable cause must be communicated to the arresting officer in order for the collective knowledge doctrine to apply. [D.E. 419 (Df's Post-Hearing Reply) at 7].

Defendant asserts that the Court in *Hensley* "emphasized the significant details listed in the wanted flyer, including the circumstances of the crime as well as the identity and whereabouts of the suspect." [*Id.*]. In fact, the flyer only stated that Hensley was wanted for investigation of an aggravated robbery, and included his description, the date and location of the alleged robbery, a request that Hensley be picked up and held if he were located, and a warning that Hensley should be considered armed and dangerous. 469 U.S. at 677. There was no mention of specific and articulable facts that led the requesting department to suspect Hensley was involved in the robbery. There is no appreciable difference between the type of information found in the "wanted flyer" in *Hensley* and that known to Sergeant Martinez when he stopped and searched Defendant's truck.[7]

---

[7] In attempting to distinguish from *Hensley*, Defendant asserts that none of the details supporting probable cause were relayed to the officers who stopped and searched Defendant's truck. [*Id.* at 7]. According to Defendant, the testimony presented at the suppression hearing showed that "[t]he officers conducting the search and seizing the contraband before Sergeant Martinez arrived on the scene were not assigned to the narcotics task force, had no information about [Defendant] or the investigation, and did not communicate in any way with any of the Federal or State agents doing so." [*Id.* at 6-7]. "Further, the narcotics officers and DEA Agents did not even relay their suspicions that the vehicle actual[l]y contained narcotics." [*Id.* at 9].

*Hensley* clearly holds that, at least with regard to an investigatory stop, there is no requirement that police who have reasonable suspicion sufficient to justify a stop communicate the basis of that reasonable suspicion to police who have been instructed to effectuate the stop. Given its favorable discussion of *Whiteley*, *Hensley* also supports the government's position that police who have probable cause to search a vehicle need not communicate the basis of that probable cause to police who have been instructed to stop and search the vehicle. *See also United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (officer who arrested the defendant without knowing all of the facts already uncovered by other officers involved in the investigation may nevertheless "act on the strength of the radio communication directing him to 'stop the vehicle and secure the scene.'" (citing *Whiteley*)).

The Court finds that, at the time Special Agent Fernandez gave the order to stop Defendant's truck, he had more than enough information to support a probable cause determination that the vehicle contained two kilograms of cocaine. Even if facts supporting probable cause were not relayed to Sergeant Martinez, under *Hensley*, the Court would nevertheless hold that the search was valid and, therefore, recommend denial of Defendant's motion to suppress.

But given the facts before us, we need not solely rely on *Hensley* to conclude that the search of Defendant's truck was valid. Cases from our own Circuit recognize the collective knowledge doctrine and compel the disposition of Defendant's motion to suppress. "Probable

---

It is clear from the testimony that it was Sergeant Martinez who searched Defendant's truck, not the patrol officers who activated their flashing lights and pulled Defendant over based on Martinez's directions. Sergeant Martinez knew that officers involved in the narcotics investigation thought there were two kilos of cocaine in Defendant's vehicle. [*Id.* at 85, 95]. Once the stop was made and he had spoken briefly with Defendant, Martinez "immediately went to the front of the car. I opened the glove compartment and under – there was a little compartment that pulled out and in there was a white plastic bag . . . [with] two kilos of cocaine. . . . I took it out. I placed it on the front seat. . . . I went to the back of the car and I told Detective Benavides that we did have it." [*Id.* at 87-88].

cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). This Court may examine the collective knowledge of the officers "if they maintained at least a minimal level of communication during their investigation." *Id.* (citing *United States v. Else*, 743 F.2d 1465, 1476 (11th Cir. 1984) ("where a group of officers is conducting an operation among them, we look to the collective knowledge of the officers in determining probable cause.")); *see also Kapperman*, 764 F.2d at 791 n.5.

We easily determine that the agents involved in this investigation maintained more than a minimal level of communication during the events on September 12th. Special Agent Fernandez supervised the investigation. He and Detectives Benavides and Young participated in the surveillance of Defendant that day, and each reported their observations via radio to others involved in the investigation.[8] Sergeant Martinez was directed by Detective Benavides to stop Defendant's truck (presumably after Special Agent Fernandez gave the order to do so). The sergeant was told that Defendant was believed to be transporting two kilos, based on surveillance done as part of the narcotics investigation. The three primary officers, along with Sergeant Martinez, worked as a unit to follow, observe, and ultimately stop Defendant. Accordingly, the question of probable cause should be determined based on the collective knowledge of the officers. Having already determined that Special Agent Fernandez had probable cause for the search, this Court has no difficulty imputing that probable cause to

---

[8] Although Detective Benavides did not, in so many words, testify that he relayed details of the exchange he witnessed between Defendant and the man in the Mercedes while they were parked in the cul-de-sac, the Court finds that he did because both Detective Young and Special Agent Fernandez credibly testified that they heard a report of that exchange over the radio. Only Detective Benavides was in a position to witness that event.

Sergeant Martinez. Accordingly, on this basis the Court finds that the search of Defendant's vehicle was valid and recommends that Defendant's motion to suppress be denied.

We reject Defendant's assertion that some, if not all, of the information supporting probable cause should have been communicated to Sergeant Martinez in order for the collective knowledge doctrine to apply. Defendant has failed to cite any authority that requires such a broad and technical dissemination of facts, and Eleventh Circuit caselaw does not so hold. *See Else*, 743 F.2d at 1476 (where (1) undercover agent involved in a narcotics investigation had probable cause to believe that cocaine was in the defendant's car, (2) that undercover agent contacted another officer to set up surveillance of the scene where a drug transaction was expected to occur, (3) the second officer, who was told that cocaine was in the car, later arrested defendant and searched his car, and (4) the undercover agent was in the vicinity when the search occurred, the court found ample communication between the two officers to apply the collective knowledge doctrine); *Kapperman*, 764 F.2d at 791 n.5 (discussing collective knowledge and concluding that the fact that the arresting officer "may not have known all of the facts already uncovered in the investigation does not render the 'arrest' unlawful";); *see also United States v. Terry*, 400 F.3d 575, 598 (8th Cir. 2005) (even if the officer who seized ammunition from the defendant's car did not personally know of the existence of a protection order which prohibited the defendant from possessing ammunition, because the officer had met and communicated with other officers who *were* aware of the protection order, the court determined that there was "some degree of communication" between the officers such that it could impute knowledge to the arresting/searching officer).

Because the Court finds that probable cause existed to search Defendant's truck, no Fourth Amendment violation occurred and this Court recommends that the motion to suppress be denied.[9]

### III.   CONCLUSION

Based on the foregoing, it is hereby

**RECOMMENDED** that Defendant Ricardo Olmedo's Motion to Suppress Fruits of Illegal Search and Seizure [**D.E. 320**] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Adalberto Jordan, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.  *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 20th day of March, 2008.

EDWIN G. TORRES
United States Magistrate Judge

Copies provided to:
Honorable Adalberto Jordan
Counsel of Record

---

[9] Given the finding that officers had ample probable cause to search Defendant's truck, we need not adjudicate the issue of Defendant's consent to search. The consent issue was raised at the hearing but the government does not rely on it to support its position.