# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 07-20759-CR-JORDAN-TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

RICARDO OLMEDO,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT
## RICARDO OLMEDO'S MOTION TO SUPPRESS WIRETAP EVIDENCE

THIS CAUSE came before the Court on Defendant Ricardo Olmedo's Motion to Suppress Wiretap Evidence [**D.E. 321**] and the government's Opposition thereto [D.E. 363].[1] The motion concerns the government's interception of oral communications pursuant to Title III wiretap orders. A hearing was held in this case on February 21, 2008, on an unrelated motion to suppress evidence seized during a search of Defendant's truck [D.E. 320].[2] At that hearing, defense counsel moved *ore tenus* for a *Franks*[3] hearing. Having carefully considered the motion and opposition thereto, the applications for the interception of wire communications that were provided to the Court, and the arguments of counsel, and being fully advised in the premises, the Court DENIES Defendant's request for a *Franks* hearing for

_____

[1]     This matter was referred to the undersigned Magistrate Judge by the Honorable Adalberto Jordan for report and recommendation. [D.E. 369].

[2]     A transcript of the hearing is docketed as D.E. 420. Defendant's motion to suppress evidence seized from his truck is the subject of a separate Report and Recommendation that was issued on March 20, 2008. [D.E. 441].

[3]     *Franks v. Delaware*, 438 U.S. 154 (1978).

the reasons explained below. Furthermore, the Court recommends that Defendant's motion to suppress be DENIED as set forth below.

## I.   BACKGROUND

Defendant was indicted along with eighteen other individuals and charged with one count of conspiracy to possess with the intent to distribute cocaine, heroin, crack cocaine, and marijuana, and one count of possession with the intent to distribute cocaine. [D.E. 11]. His arrest on September 12, 2007, stemmed from a Drug Enforcement Administration ("DEA") investigation of narcotics trafficking activities that resulted in the issuance of Title III wiretap orders for the cellular telephone of his son, co-defendant Michael Olmedo. The original wiretap order was issued by the Honorable Patricia A. Seitz on July 25, 2007, for a thirty-day period. *See* July 25, 2007, Sealed Order Authorizing the Interception of Wire Communications ("July Order"). On August 23, 2007, Judge Seitz re-authorized the wiretap for an additional thirty-day period. *See* August 23, 2007, Sealed Order Authorizing the Continued Interception of Wire Communications ("August Order").[4]

On September 12, 2007, as a result of information obtained during the wire interception, agents observed Defendant engage in a narcotics transaction in which he took possession of two kilograms of cocaine. After agents conducted a traffic stop of Defendant's truck, the cocaine was seized and Defendant was arrested.

The pending motion concerns the wiretap orders. Defendant seeks to suppress all communications intercepted pursuant to the wiretap. He contends that the government failed to present sufficient facts to satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c) or to support a judicial finding of "necessity" as required by 18 U.S.C. § 2518(3)(c). Defendant also

---

[4]     These two wiretap orders, and the applications and affidavits supporting them, were provided to defense counsel during discovery in this case, and will be filed with the Clerk of Court so that the court record in this matter is complete.

contends that the government failed to minimize the intercepted conversations as required by 18 U.S.C. § 2518(5).  Finally, defense counsel made an *ore tenus* motion at the suppression hearing for a *Franks* evidentiary hearing on the ground that the that the affidavits supporting the wiretap applications contained intentional omissions with regard to the investigative techniques pursued by law enforcement.

## II.   AFFIDAVITS SUPPORTING THE WIRETAP APPLICATIONS

According to the affidavit submitted by DEA Special Agent Shane Catone in support of the original wiretap application, in December 2006 the DEA and other law enforcement agencies began to investigate a drug trafficking organization believed to be headed by co-defendant Michael Olmedo.  *See* Agent Catone's July 25, 2007, Affidavit in Support of an Application for the Interception of Wire Communications ("July Affidavit"), ¶¶ 6, 28.  Based on the investigation up through the date of the application, Agent Catone stated that he believed the organization was responsible for distributing multiple kilograms of cocaine, marijuana, and tens of thousands of MDMA pills in the South Florida area.  *Id.*, ¶ 6.  The organization was believed to coordinate and oversee the shipment of cocaine from Mexico through the Texas border to South Florida in preparation for distribution.  *Id.*

Agent Catone's affidavit detailed the investigation from December 2006 though July 25, 2007.  *Id.*, ¶¶ 28-47.  Much of the information obtained to date came from a cooperating defendant ("CD") who had proven reliable in three previous cases and a confidential source ("CI") who had previously provided information in another case that led to the arrest and recovery of narcotics.  *Id.*, ¶¶ 26-27. Over the course of the first seven months in 2007, the CD and the CS spoke on many occasions with co-conspirators about past, current, and future drug transactions, but agents were able to confirm only two narcotics transactions.  On June 14, 2007, two co-defendants provided the CS and the CD with one ounce of cocaine.  *Id.*, ¶ 34.  On

June 21, 2007, another co-defendant provided the CD with one ounce of heroin after Michael Olmedo coordinated its delivery to the CD.  *Id.*, ¶ 35.

On the date the government applied for a wiretap, it had identified only seven of the 19 individuals indicted in this case.  *Id.*, ¶ 10.  According to Agent Catone, agents did not know the identities of all members of the organization, all of the importation routes, transportation routes, and locations used to conceal narcotics and narcotics proceeds, and all of the assets purchased from the proceeds derived from the sale of narcotics.  *Id.*, ¶ 48.  Moreover, Agent Catone explained, the government had not been able to fully identify the majority of the individuals operating in the organization or where many of them were residing and their precise roles in the organization.  *Id.*

Agent Catone's affidavit details the investigative techniques that agents had used, and those they elected not to use, in connection with their investigation.  *Id.*, ¶¶ 51-57.  According to Agent Catone, although much of the information agents received came from the CD and CS, it appeared unlikely that any of the co-conspirators would disclose any specific information to the CD or CS concerning their ultimate source of supply in the Miami area, other sources of supply not yet identified, the locations where they stored the drugs and drug proceeds, or the precise manner in which they laundered their drug proceeds.  *Id.*, ¶ 51.  He explained that this type of information is "guarded" and only supplied to people on a need-to-know basis, in order to protect shipments of narcotics and drug proceeds from seizure by authorities, theft by other drug traffickers, and to guarantee that their position of power in the organization will not be supplanted by competitors.  *Id.*

Agent Catone also stated that undercover agents had not been able to infiltrate the organization.  *Id.*, ¶ 56.  Even if they were able to do so, he believed they would be unable to obtain evidence necessary to charge all the participants in the conspiracy, for some of the same

reasons that the CD and CS were not able to obtain additional information about the organization. *Id.*

Agents conducted physical surveillance of the co-conspirators but had only limited success in achieving the goals of the investigation. *Id.*, ¶ 52. Agent Catone especially noted the counter-surveillance techniques employed on a regular basis by some of the co-conspirators, such as driving very fast, making several turns in residential areas, and making sharp turns or u-turns in the middle of the street to determine if they were being followed. *Id.* This, the agent explained, made surveillance extremely difficult or impossible. *Id.* Agent Catone also stated that on several occasions the co-conspirators traveled to locations that were hard to observe and where surveillance vehicles were easily recognized. *Id.*, ¶ 53. He cited one instance where a surveillance unit was detected by a co-conspirator who was meeting with the CD. *Id.* Moreover, he noted, surveillance allows agents to confirm meetings between alleged conspirators but not the purpose of the meeting or the content of the conversation. *Id.* Thus, agents were not able to learn identifying information about all the narcotics transporters, suppliers, and distributors. *Id.*, ¶ 52.

Agent Catone also described agents' analysis of toll records and pen register and trap and trace information for Michael Olmedo's telephone (the subject of the wiretap). He noted that agents had learned through these records that the target phone was used to make calls to, or receive calls from, other telephones, some of which had false subscriber information which prevented further identification of co-conspirators of the organization. *Id.*, ¶ 54. Additionally, Agent Catone explained that pen register records do not identify the individuals who actually make and receive phone calls, nor provide the content of the conversations. *Id.* Therefore, toll records did not help agents achieve all the goals of the investigation.

Agent Catone also stated that a grand jury investigation or interviews of the target subjects would not be successful in exposing the full nature and scope of the criminal activity or the identities of all the participants. *Id.*, ¶ 55. The target subjects would be alerted to the investigation, likely causing them to become more cautious, flee, and possibly destroy or hide physical evidence. *Id.* Any witnesses subpoenaed to the grand jury would likely invoke their Fifth Amendment privilege and refuse to testify. *Id.* Finally, the potential for violence associated with narcotics traffickers also acted as a significant deterrent to securing truthful testimony from potential grand jury witnesses. *Id.*

Finally, Agent Catone stated that the use of search warrants and interviews at the time the wiretap application was prepared was premature. *Id.*, ¶ 57. He stated that the use of these techniques would reveal the fact of the investigation to the targets of the investigation and would prevent agents from identifying other co-conspirators or seizing contraband, and might lead to the flight of targets from the jurisdiction. *Id.*

For the reasons described in his affidavit and summarized above, Agent Catone advised Judge Seitz that "[n]ormal investigative procedures have been used and have not succeeded in achieving the goals of the investigation, or have been tried and failed or had only limited success, or reasonably appear to be unlikely to succeed if tried, or they are too dangerous to employ." *Id.,* ¶ 50. As noted, Judge Seitz authorized the wiretap and interception began that day.

On August 23, 2007, the government applied for a continuation of the wiretap. Agent Catone described in his supporting affidavit the information gained by law enforcement as a result of the July 25, 2007, wiretap. *See* Agent Catone's August 23, 2007, Affidavit in Support of an Application for an Order Authorizing the Continued Interception of Wire Communications ("August Affidavit"), ¶¶ 28-52. As in his previous affidavit, he identified the

alternative investigative techniques already employed and their success, as well as those considered but rejected. *Id.*, ¶¶ 56-62. In particular, he noted additional counter-surveillance techniques employed by the co-conspirators. *Id.*, ¶¶ 57-58. He reported the seizure of narcotics on two occasions that resulted directly from information gained through wire interceptions and follow-up physical surveillance, *id.*, ¶ 58, and the identification of several more co-conspirators, some of whose last names were unknown. *Id.*, ¶ 10. He also noted that conversations between co-conspirators were often of short duration, in coded language, and involved unknown parties. *Id.,* ¶ 54. In summary, Agent Catone stated that although the initial period of authorized wiretapping had moved the investigation forward, the objectives of the investigation had not yet been satisfied. *Id.*, ¶¶ 54, 63. Specifically, the agent stated that law enforcement had not identified the source of supply in South America from whom the Olmedo organization received narcotics for distribution; the transportation routes used to smuggle narcotics into the United States; all the stash houses utilized by the organization to store narcotics in South Florida; the methods by which narcotics proceeds were laundered; or all the individuals in the distribution network. *Id.,* ¶63. Judge Seitz granted the reauthorization request on August 23, 2007. Defendant was arrested three weeks later.

### III.   ANALYSIS

The district court's authority to authorize electronic surveillance is found in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. *See, e.g.,* *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). Title III sets forth numerous requirements that the government must meet before a wiretap may be authorized, *see* 18 U.S.C. § 2518(1), the findings the district court must make, *see* 18 U.S.C. § 2518(3), and

requirements for the district court's authorization order, *see* 18 U.S.C. § 2518(4).  Title III contains its own exclusionary rule.  *See* 18 U.S.C. § 2518(10).[5]

### A.   *Necessity of Electronic Surveillance Under 18 U.S.C. §§ 2518(1) and 2518(3)(c*

Defendant maintains that the wiretaps were unnecessary because the normal investigative techniques then being employed by law enforcement were "very successful" and continued success was not only quite likely, but "virtually assured."  [D.E. 321 at 7-8].  He asserts that "[a]t least two confidential informants, several agents and law enforcement personal [sic], surveillance, pen registers, and actual seizures not only produced sufficient evidence to successfully prosecute the Defendants in this case, but wholly obviated the necessity for the wiretaps now at issue."  [*Id.* at 8].  Defendant contends that the CD and CS had  provided the government with the identities of co-conspirators, the nature of the alleged crimes, the dates the alleged crimes were committed, consensual recordings of conversations with co-conspirators, and both had participated in the seizure of heroin and cocaine.  *Id.* at 11.  Thus, Defendant posits, had the informants' efforts continued, "law enforcement could have built seizure upon seizure, conversation upon conversation, and returned an Indictment as strong as, if not stronger than, the one that was eventually returned."  *Id.*

An application for a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  If the application lists this statement, the district court judge must then make an independent

---

[5]    The government does not contest that Defendant, whose communications were intercepted during the course of this investigation, has standing to challenge the surveillance that occurred in this case.  Defendant does not challenge Judge Seitz's determination that the applications for wiretap authorization were supported by probable cause. *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (citing *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978)).

determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).

This "necessity" requirement is "designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986) (citing *United states v. Giordano*, 416 U.S. 505, 515, 94 S. Ct. 1820, 1826, 40 L. Ed. 2d 341 (1974)).  The legislative history of § 2518 makes clear that the intercept application must be tested in a "practical and commonsense fashion." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978) (internal citation omitted). The "determination of when the Government has satisfied [the necessity requirement] must be made against flexible standards, and [] each case must be examined on its own facts." *Id.; see also Nixon*, 918 F.2d at 901 ("What amount of evidence will be sufficient to obtain a conviction is an imprecise concept.").  For that reason,

> courts will not invalidate a wiretap order simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not.  It is enough if the affidavit explains that the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves.

*Hyde*, 574 F.2d at 867; *see also Van Horn*, 789 F.2d at 1496 ("The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.").

Even if alternative investigative techniques yield a certain degree of measurable success, this does not preclude the Government from seeking a wiretap.  *See, e.g., United States v. Canales Gomez*, 358 F.3d 1221, 1227 (9th Cir. 2004) (government need not use all possible informants before obtaining a wiretap); *United States v. Bennett*, 219 F.3d 1117, 1122-

23 (9th Cir. 2000) (mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap; informant was able to purchase drugs from defendant but could not penetrate his organization, and further, informant's credibility as a paid informant would come under attack and would therefore require further corroborating evidence); *United States v. Jones*, 451 F. Supp. 2d 71, 83 (D.D.C. 2006) (even where the government has other evidence linking a defendant to a crime, § 2518 does not prevent it from obtaining wiretaps in order to ascertain the full extent and structure of a conspiracy); *United States v. Yeje-Cabrera*, 430 F.2d 1, 10 (1st Cir. 2005) (government is not required to take extraordinary steps to exhaust other investigative avenues before a wiretap becomes necessary).

We find that the affidavits submitted in support of the wiretaps are more than sufficient to satisfy Title III's necessity requirement. The affidavits detailed the steps that law enforcement agents took, or considered taking, during their investigation of the Olmedo drug trafficking organization. Agent Catone described the techniques utilized – two confidential informants, consensual monitoring of telephone conversations, toll records, pen registers and trap and trace devices, and physical surveillance. He described how, despite using these techniques, law enforcement was not able to identify the full scope and membership of the drug trafficking organization. He also described how other traditional investigative techniques – grand jury subpoenas, interviews, and search warrants – were not reasonably likely to succeed.

Contrary to Defendant's assertion, the government has made an adequate showing that it was not successful at infiltrating the Olmedo organization. As described in Agent Catone's July affidavit, some seven or eight months into the investigation, no undercover agent had been able to infiltrate the organization, and the CD and CS had only been able to purchase one

ounce of heroin and one ounce of cocaine from four co-conspirators.[6]  Thus, prior to the initiation of the wire interception, only four of the co-defendants indicted here were tied to seizures of narcotics, and those seizures were minuscule in comparison to the scope of the charged conspiracy.  Although the CD and CS were able to engage some of the co-conspirators in monitored or recorded conversations, the conversations related to other trafficking activities that could not be substantiated.  S*ee, e.g.,* July Affidavit, ¶¶ 32-33, 37-40.  Moreover, these conversations did not lead to the identification of all members of the charged conspiracy, the source of drugs in the Miami area, other sources of supply, where the drugs and drug proceeds were located, or the manner in which the drug proceeds were laundered.  *Id.*, ¶ 51.  Agent Catone explained that the known members of the conspiracy were unlikely to disclose this type of information to the CD or CS because it is guarded and supplied on a need-to-known basis. It is clear that the confidential sources could not penetrate the organization at a sufficient level to disclose its inner workings.  No undercover agent had been able to infiltrate the organization.  As noted, only seven of the 19 individuals ultimately charged in this case had been identified at the time of the original wiretap application.

Moreover, the government's use of informants does not necessarily negate the need for electronic surveillance.  In *Nixon*, for instance, the appellants argued that wiretaps were unnecessary because the government had already obtained through less intrusive investigative techniques sufficient evidence to prosecute and convict those involved in a drug conspiracy. 918 F.2d at 901.  The Eleventh Circuit rejected this argument, upholding the wiretaps even though the judge authorizing them had been advised, among other things, that at least two

---

[6]      As the government correctly points out, the seizures of narcotics that occurred on August 1 and 2, 2007, which Defendant cites in support of his argument that traditional investigative techniques were working, happened *after* the wiretap was authorized and were the direct result of intelligence gained from intercepted conversations.  *See* August Affidavit, ¶ 58.

of the targets had agreed to sell narcotics to undercover agents, and that a confidential informant actually had purchased drugs from members of the conspiracy. *Id.* The court refused to conclude that the issuing judge had "erred in concluding that alternative investigative techniques neither had succeeded, nor would succeed, in providing enough evidence to prove the conspirators' guilt beyond a reasonable doubt." *Id.*

Similarly, in *United States v. Messersmith*, 692 F.2d 1315, 1317-18 (11th Cir. 1982), the government utilized an informant but the main target of the drug investigation was "very wary of the traditional investigative techniques which could have substituted for the challenged electronic surveillance." The target had patted down the informant to check for the presence of recording devices, and the location of his apartment prohibited effective physical surveillance. *Id.* Given that the aim of the investigation was to identify the organized crime members who controlled the target's enterprise, and the corresponding unwillingness of the target to discuss this topic with the informant, electronic surveillance offered the only possibility of success. *Id.*

Agent Catone's affidavits also set forth why physical surveillance was unlikely to produce sufficient evidence to determine the full scope and nature of the conspiracy. Agents attempted surveillance with vehicles, but the co-conspirators regularly employed counter-surveillance measures or traveled to locations that were hard to observe and where surveillance vehicles were easily recognized. Thus, agents were severely limited in their ability to identify the additional principal members of the organization or learn identifying information about the narcotics transporters, suppliers, and distributors. Moreover, physical surveillance in and of itself often does little to aid in gathering sufficient evidence of the criminal activities under investigation. It shows merely that one or more individuals have met, but does nothing to prove the subject matter of their conversations, their plans, or any

details regarding the criminal conspiracy.   As the court stated in *Van Horn*, even if surveillance were successful, "it could only lead to evidence that members of the conspiracy were meeting, and not to direct evidence of criminal activity."   789 F.2d at 1497.  *See also Messersmith*, 692 F.2d at 1318; *Hyde*, 574 F.2d at 868.

The affidavits also detail the limited value of the toll records, pen registers and trap and trace devices.  Those records provided circumstantial evidence that the telephones were used to make or receive calls, but did not identify the actual individuals using the telephones or the content of their conversations.  Moreover, agents discovered that the subscriber information for some of the telephone numbers included false names and/or addresses, prohibiting further identification of co-conspirators. Thus, these investigative techniques were of marginal assistance in obtaining the goals of the investigation.  *See, e.g., United States v. Cantu*, 625 F. Supp. 656, 673 (N.D. Fla. 1985) (use of pen registers is of limited use as an investigative tool because it does not identify the individuals actually making or receiving the calls, or the nature and substance of the conversations).

The affidavits also show that law enforcement contemplated the use of a grand jury investigation and interviews of the targeted individuals.  However, these techniques were rejected as being likely to expose the full nature and scope of the criminal activity or identities of the participants because, as Agent Catone explained, grand jury subpoenas or interviews would only alert the target subjects to the investigation, causing them to become more cautious, flee, or destroy or hide evidence.  Additionally, any target subjects who were subpoenaed would likely invoke their Fifth Amendment privilege and refuse to testify. Finally, the affidavits mentioned the potential for violence associated with narcotics traffickers as a deterrent in securing truthful testimony for potential grand jury witnesses.

Finally, the affidavits state that search warrants and interviews were rejected as investigative tools because they would alert the targets to the existence of the investigation, prevent law enforcement from identifying other co-conspirators or seizing contraband, and might lead to targets fleeing the jurisdiction.

The Court finds that the conventional techniques utilized by the government were doing little to expose the entire workings of a widespread narcotics trafficking conspiracy. This circuit has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members.  In *Hyde*, the wiretap affidavit revealed that the government had a web of informants that would have enabled the government to prosecute lower-level conspirators.  574 F.2d at 868-69.  However, because the government could not make a case against the "top-level conspirators," the court found that "the wiretap was necessary to ascertain the full scope of the conspiracy under investigation and to gather evidence against the leaders of the organization."  *Id.* at 869.  In approving the issuing judge's determination that ordinary techniques were not enough to collect sufficient information against the top-level leaders, the court explained:

> Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of the participants learned.

*Id.* (internal citation omitted).  As a result, the court affirmed the lower court's conclusion that the government had satisfied the necessity requirement under § 2518(3)(c).  *Id.  See also Messersmith*, 692 F.2d at 1317-18; *Cantu*, 625 F. Supp. at 673-74.

The wiretap statute does not require a piecemeal, uncoordinated approach to the investigation of the large narcotics trafficking conspiracy alleged in this case.  Rather, the statute simply requires that the affiant explain to the issuing judge the difficulties

surrounding the traditional investigative techniques that already had been taken, or been contemplated to have been taken.  This was done, and Judge Seitz did not err in assessing those difficulties and signing the orders to intercept.  This Court finds that the necessity requirements of § 2518(1)(c) and § 2518(3)(c) have been satisfied and no basis to suppress on this ground exists.[7]

### B.   _Minimization Under 18 U.S.C. § 2518(5)_

Defendant also claims that the government failed to minimize the intercepted telephone conversations as required by 18 U.S.C. § 2518(5).  He notes that the government intercepted hundreds of communications made by him but that many are not pertinent to the charges against him in this case.  Thus, he posits, the government's execution of the wiretap orders was not carried out "in such a way as to minimize the interception of communications not otherwise subject to interception."  18 U.S.C. § 2518(5).  He claims it is the government's burden to demonstrate the wiretap was conducted in a manner that minimized the government's interception of non-relevant conversations.

The purpose of the minimization requirement is to ensure that intrusions into the privacy of those whose communications are intercepted are held to a minimum, consistent with the purposes of the wiretap.  _Hyde_, 574 F.2d at 869.  The minimization effort must be

---

[7]      The Court rejects Defendant's contention that Agent Catone's affidavits contain "boilerplate" allegations that alternative investigative techniques had been tried but failed. [D.E. 321 at 7, 13].  Agent Catone more than adequately described what traditional investigative techniques had been attempted, why they had not achieved the goals of the investigation into this widespread narcotics trafficking organization, and those techniques contemplated but rejected, and why.  The affidavits in this case are unlike those in the cases cited by Defendant, _United States v. Kalustian_, 529 F.2d 585 (9th Cir. 1975), and _United States v. Lilla_, 699 F.2d 99 (2d Cir. 1983).  The supporting affidavits in those cases truly were devoid of facts showing what traditional investigative techniques had been utilized by law enforcement, and how they had been insufficient to achieve the goals of the respective investigations.  That simply is not the case here.

objectively reasonable in light of the circumstances confronting the interceptor. "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978). A "test of reasonableness" is applied to the particular facts of each case. *Id.* at 139-40; *see also Hyde*, 574 F.2d at 869.

A preliminary observation is in order. Although Defendant states that the government intercepted "hundreds of communications made by [Defendant]" and that a "great deal of these conversations are not pertinent to the charges against [him]" (and thus they all should be suppressed), *see* D.E. 321 at 14, he does not identify any specific conversation or patterns of conversations that should not have been intercepted. This general allegation that the government did not comply with the statutory minimization requirement is inadequate. *See United States v. Carter*, 449 F.3d 1287, 1295 (D.C. Cir. 2006) (defendant must identify particular conversations so that the government can explain their non-minimization; general allegation that government did not minimize is inadequate).

Both wiretap orders provided "that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not subject to interception under Chapter 119 of Title 18, United States Code." *See* July Order at 5-6; August Order at 5-6. Both affidavits supporting the applications for wiretap orders set forth minimization requirements to be employed during the monitoring of the wiretaps. Notably, the affidavits state that "[i]nterception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the TARGET SUBJECTS or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature." *See* July Affidavit, ¶ 59; August Affidavit, ¶ 65.

Defendant has not suggested that the government failed to comply with these directives, other than by a vague assertion that because the government intercepted many nonpertinent conversations, it must not have complied with the minimization requirements.

In any event, according to the government, the vast majority of the conversations were less than two minutes long. Of the 103 intercepted calls that involved this Defendant, only 20 calls were longer than two minutes, and a majority of those calls lasted less than three minutes. Although there is no bright-line rule as to how long an agent can listen to a call to determine whether it is pertinent, many courts have approved two-minute and three-minute cutoffs as a reasonable guide.

> Many courts have held that calls lasting less than three minutes cannot reasonably be expected to be minimized since it takes that long to ascertain the relevancy of a particular conversation. While some courts have applied a two minute cut-off mark, the three minute cut-off has been applied in cases, such as this one, where the identity of various coconspirators is unknown. The Court finds a three minute cut-off reasonable in this case as there were a number of potential coconspirators identified by [the defendant] whose identities were difficult to ascertain.

*United States v. Cleveland*, 964 F. Supp. 1073, 1094 n.10 (E.D. La 1997) (collecting cases in which the two and three-minute cutoffs were found to be reasonable; internal citations omitted). *See also United States v. Santiago*, 389 F. Supp. 2d 124, 130 (D. Mass. 2005) (noting the difficulty for agents in determining whether short calls are innocuous before monitoring is terminated; "the agents' listening to a call for two minutes, even if it turned out to be innocuous, was reasonable."); *United States v. Scott*, 516 F.2d 751, 757 n.15 (D.C. Cir. 1975) (noting that courts have held that intercepted conversations of less than two minutes may be disregarded in evaluating compliance with the minimization requirement).

There may be any number of reasons why "the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable." *Scott v. United States*, 436 U.S. 128, 140 (1978). The nonpertinent calls may have been very short, one-time only calls,

ambiguous in nature, or apparently involved guarded or coded language.  *Id.*  "In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination."  *Id.*  In addition, "it is also important to consider the circumstances of the wiretap.  For example, when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise."  *Id.* at 132-32, 140 (concluding that the government's minimization efforts were reasonable in a case involving one wiretap of one month's duration, where wiretap order was issued based on a probable cause belief that nine individuals were conspiring to import and distribute narcotics in Washington, D.C., and where intercepts led to the indictment of fourteen people).

In this case, one of the primary purposes of the wiretap was to ascertain the identity of the unknown co-conspirators in what was believed to be a large drug trafficking organization based in South Florida.  *See, e.g.*, July Affidavit, ¶¶ 6, 48.  The government's investigation of the Olmedo drug trafficking organization began in December 2006, yet at the end of July 2007 when the government first applied for the wiretap authorized in this case, it was aware of the identities of only seven of the 19 co-conspirators eventually indicted in the case.  *Id.*, ¶¶ 10, 28; D.E. 11.  Agent Catone detailed the steps law enforcement had taken, and the limited success it had achieved using traditional investigative techniques.  Additionally, Agent Catone noted that drug traffickers commonly use coded language in an effort to disguise their conversations about narcotics transactions.  *Id.*, ¶ 3.

Under the circumstances, where the conspiracy was believed to be widespread and involve other unknown individuals, where coded language was expected to be used (and in fact was used as detailed in the affidavit supporting the application for a continued wiretap, *see* August Affidavit, ¶¶ 29-52), where most of the calls were of short duration, and where

Defendant has failed to identify any particular conversation that the government failed to properly minimize, the Court finds that the government has demonstrated compliance with the minimization requirements of § 2518(5).  The motion to suppress on this basis should be denied.

### C.   *Franks v. Delaware Issue*

At the February 21st suppression hearing, defense counsel moved *ore tenus* for a *Franks* evidentiary hearing.  Although the *Franks* decision was never cited in Defendant's wiretap motion, counsel argued the issue was implicit.  He referred to page 5 of the motion where he recited the requirement that an affidavit supporting an application for a wiretap order contain "a **truthful** 'factual predicate' to justify the use of a wiretap."  [D.E. 420 (Transcript of Feb. 21, 2008, Suppression Hearing) at 8 (citing to D.E. 321 at 5)].  *See also* 18 U.S.C. §§ 2518(1)(b) & (c) (each wiretap application shall include "a full and complete statement of the facts and circumstances relied upon by the applicant" justifying his belief that a wiretap should be authorized and "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous").  Counsel asserted that the statements in Agent Catone's affidavits regarding the alternative investigative techniques that had been utilized (and which had not been completely successful) were boilerplate allegations that were unsupported by facts, and that the affidavits omitted other things the CD and CS could have done to aid the investigation.  [*Id.* at 5-11].  Counsel requested an opportunity to supplement his *ore tenus Franks* motion with specific allegations of the alternative investigative techniques that should have been pursued.  [*Id.* at 11 ].

The Court tabled the issue [*id.*] but took it up again at the end of the hearing.  [*Id.* at 187-189].  The Court explained that after reviewing Defendant's wiretap motion, and *United*

*States v. Carrazana*, 921 F.2d 1557 (11th Cir. 1991),which defense counsel cited in support of his request for a *Franks* evidentiary hearing, it had concluded that Defendant had *not* raised a proper *Franks* challenge and therefore was not entitled to an evidentiary hearing on the affidavits. [*Id.* at 187]. The Court granted defense counsel's request to provide supplemental authority to support his position [*id.* at 187-88], but other than *United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985), cited in Defendant's motion, and one additional case mentioned at the hearing, *United States v. Calisto*, 838 F.2d 711 (3rd Cir. 1988), counsel has not done so.

Having considered *Carrazana*, *Calisto*, and *Ippolito*, the Court finds these cases do not support Defendant's request for an evidentiary hearing on statements in Agent Catone's affidavits about investigative methods utilized or contemplated but rejected. Defendant simply did not make a *Franks* challenge to the affidavits. *Franks* holds that where a defendant makes a preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard for its truth, and the false statement was necessary to the finding of probable cause, then a hearing on the affidavit must be held at the defendant's request. 438 U.S. 154 (1978). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine." *Id.* at 171. Significantly, the allegations of deliberate falsehood or reckless disregard for the truth must be accompanied by an offer of proof." *United States v. Haimowitz*, 706 F.2d 1459, 1556 (11th Cir. 1983) (quoting *Franks*, 438 U.S. at 171).

*Franks* also applies to material omissions of fact. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (111th Cir. 1994); *United States v. Clapp*, 46 F.3d 795, 799 (8th Cir. 1995). Any challenged omissions in an affidavit must have been made intentionally or with a reckless disregard for the accuracy of the affidavit. *Madiwale*, 117 F.3d at 1327. Omissions are made

with reckless disregard if the information omitted is the kind of information that a reasonable person would expect a judge to want to know. *Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000). Negligent or immaterial omissions, however, will not invalidate a warrant. *Madiwale*, 117 F.3d at 1327.

Here, Defendant failed to identify any omissions made in Agent Catone's affidavits or offer any proof to support his claim that Agent Catone omitted investigative techniques law enforcement did or could have or should have pursued. Accordingly, Defendant's request for a *Franks* hearing is denied.

## IV.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Defendant Ricardo Olmedo's *ore tenus* Motion for a *Franks* hearing is **DENIED.**

Furthermore, it is hereby **RECOMMENDED** that Defendant Ricardo Olmedo's Motion to Suppress Wiretap Evidence [**D.E. 321**] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Adalberto Jordan, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993);

*LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410

(5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

   **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 26th day of March,

2008.

                _____

                EDWIN G. TORRES
                United States Magistrate Judge

Copies provided to:
Honorable Adalberto Jordan
Counsel of Record